IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MCDAVID KNEE GUARD, INC., and STIRLING MOULDINGS LIMITED, | ) ) ) No. 08 CV 6584 |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NIKE USA, INC., | ) ) |
| Defendant. | ) |

# **MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

JAMES F. HOLDERMAN, Chief Judge:

Plaintiffs McDavid Knee Guard and Stirling Moulding Limited (collectively "McDavid") filed this lawsuit against defendant Nike USA, Inc. ("Nike"), alleging that Nike has been and currently is importing foam padded shorts manufactured in Taiwan by a process that infringes U.S. Patent No. 6,743,325 ("'325 patent"), which was issued on June 1, 2004, for a method of manufacturing "flexible material . . . suitable for providing protective war [sic] for human and animal bodies." ('325 patent, Abstract.)

This court issued its claim construction opinion as to the '325 patent's disputed claim terms on September 17, 2009 [137]. After the court's September 17, 2009 opinion, a briefing schedule was set [140] regarding McDavid's Motion for Preliminary Injunction [52]. On October 16, 2009, McDavid filed a Supplemental Brief articulating a new theory of patent infringement [141]. On November 16, 2009, before the briefing was completed, McDavid sought leave to file a Second Amended Complaint [159]. McDavid's motion for leave to file a Second Amended Complaint has been denied in a separate opinion issued by this court today.

For the reasons explained below, McDavid's Motion for Preliminary Injunction is also denied. The court finds that McDavid has failed to demonstrate a likelihood of success on the merits and irreparable harm, which are necessary requirements for the entry of a preliminary injunction against defendant Nike.

## BACKGROUND

In its Motion for Preliminary Injunction, McDavid sought to enjoin Nike's sale and importation of Nike's "ProCombat" product line, the padding of which is manufactured in Taiwan by a process that McDavid claims infringes McDavid's '325 patent. The '325 patent, which is titled "Flexible Material," was issued to David Stirling Taylor (inventor) and assigned to his company, Stirling Moulding Limited, on June 1, 2004. Stirling Moulding Limited granted an exclusive license to McDavid Knee Guard, Inc. on June 30, 2005 to make, use, and sell products created by using the '325 patent's manufacturing method within the sporting goods field. The Abstract for the '325 patent describes the invention as:

> A flexible material [that] includes a plurality of separate resilient elements joined to a flexible, resiliently stretchable substrate. Such a material is suitable for providing protective war [sic] for human and animal bodies. Preferably, the elements includes [sic] a foam material such as a closed cell polyethylene foam and the substrate includes a knitted fabric. In an advantageous embodiment, a second flexible substrate is bonded over the elements to sandwich them between the two layers of substrate.

('325 patent, Abstract.) The Field of the Invention section of the '325 patent describes the invention as relating "to a method of manufacturing a flexible material suitable, primarily, for use as a flexible protective material to protect for human and animal bodies." (*Id.* at col. 1:16-19.)

The flexible material created by the manufacturing method described in the '325 patent allows the material to more easily conform to the body of the wearer because it is flexible in all three

2

dimensions. (*Id.* at col. 2:37-39.) Due to this increased flexibility, the material is more comfortable to wear and can accommodate movement better than previous conventional materials. (*Id.* at col. 2:39-42.) When the application for the '325 patent was filed in July 2000, the type of conventional protective material and wear that was on the market was molded to fit a particular part of a wearer's body and was produced in various shapes and sizes to fit different people. (*Id.* at col. 1:33-36.) In addition, these previous conventional items would often restrict a person's movement if worn on or near the person's joints. (*Id.* at col. 1:37-38.) Thus, the objective of the '325 patent was to overcome the drawbacks of then-existing materials by describing the method for producing material which offers increased flexibility and movement, and lends itself to a variety of uses. (*Id.* at col. 1:23-67; 2:1-16.)

Claim 1 of the '325 patent, which is the primary independent claim, states:

> 1. A method of manufacturing a flexible material comprising the steps of
>   providing a sheet of a resilient material;
>   cutting the sheet into a plurality of spaced separate elements using a cutter which is pressed into the sheet to cut therethrough;
>   making one side of the plurality of spaced separate elements to stand proud of a surface of a jig provided to hold the elements in place; and
>   bonding a flexible resiliently stretchable substrate to one side of the separate elements by heating the substrate either to activate an adhesive applied between said one side of the separate elements and the substrate or to weld the separate elements to the substrate.

(*Id.* at col. 6:34-48.)

Claim 8 of the '325 patent, which is dependent on Claim 1, states:

> 8. The method as claimed in claim 1, wherein at least said one side of the sheet is coated with a hot-melt adhesive prior to being cut into the plurality of spaced separate elements.

(*Id.* at col. 7:5-7.)

McDavid sells a product line of padded protective sportswear known as "Hexpad" in competition with Nike's "ProCombat" line. McDavid alleges that non-party Finn Technologies' ("Finn Tech") manufacturing process in Taiwan that produces the padding for Nike's "ProCombat" line of padded sportswear infringes dependent Claim 8 of the '325 patent. Another non-party company in Asia sews that padding into Nike's "ProCombat" garments before Nike imports them into the United States. McDavid is seeking to preliminarily enjoin Nike's importation and sale of the allegedly infringing products under 35 U.S.C. § 271(g).[1] According to Nike, Finn Tech used a first method ("Method 1") of manufacturing until December 25, 2008 and since that time has used a second method ("Method 2") of manufacturing to make the foam padding for Nike's "ProCombat" products.

Based on the April 15, 2009 video recording of Finn Tech's Method 2 (Dkt. 112, Apr. 15, 2009 Video Recording Inspection Finn Tech Facility & Method, attached as Ex. 21 to Pls.' Reply Mot. Prelim. Inj. (filed under seal)), which is Finn Tech's current manufacturing method, and based on the submissions by the parties' counsel, which the court will not describe in detail so as not to reveal any interested entity's confidential information, the court finds, as explained further in the

---

[1] Section 271(g) provides that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent." 35 U.S.C. § 271(g).

"Analysis" section of this opinion below, that Finn Tech's Method 2 of manufacturing process does not employ a "jig provided to hold the elements in place" ('325 patent, col. 6:43-44), as that claim term has been construed by the court.

The exact process of Finn Tech's Method 1 is unclear from the record because the details of Method 1 were not provided by either side. As discussed above, Finn Tech, according to the record, no longer employs Method 1.

## **LEGAL STANDARDS**

The Federal Circuit applies the preliminary injunction standard of the regional circuit in which the district court is located. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1367 (Fed. Cir. 2008). The Federal Circuit in *Sandoz*, citing *Abbott Labs. v. Meade Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992), determined that in the Seventh Circuit, "a party seeking a preliminary injunction must demonstrate (1) some likelihood of success on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Sandoz,* 544 F.3d at 1366-67. If the moving party fails to demonstrate either of those requirements, then a district court considering a motion for preliminary injunction need not proceed further with its analysis to deny the preliminary injunction motion. *Id.*

## **ANALYSIS**

McDavid argues that both Finn Tech's Methods 1 and 2 for creating the foam padding for Nike's "ProCombat" line infringe dependent Claim 8 of the '325 patent and that both methods, therefore, should be enjoined. Because the court finds, for the reasons stated below, that McDavid has failed to demonstrate that it is likely to succeed on the merits or that it will suffer irreparable harm in the absence of an injunction, its motion is denied.

5

**I.     Likelihood of Success**

To prevail on its Motion for Preliminary Injunction, McDavid bears the burden of proving that it is likely to succeed on the merits on its patent infringement claim against Nike. Patent infringement analysis is a two-step process: (1) determining the meaning and scope of the claims, and (2) comparing the properly construed claims to the accused process. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 374 (1996) ("Victory in an infringement suit requires a finding that the patent claim covers the alleged infringer's product or process, which in turn necessitates a determination of what the words in the claim mean.") (internal quotations omitted). "To establish infringement, every element and limitation of the claim must be present in the accused device, literally or by an equivalent." *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357-58 (Fed. Cir. 2006). Literal infringement occurs when every limitation of a claim appears in the accused method, or, in other words, when the properly construed claim literally "reads on" the accused method. *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996).[2]

**A.  Dependent Claim 8 of the '325 Patent**

Dependent Claim 8 of the '325 patent includes the following steps: (1) providing a sheet of resilient material, (2) cutting the sheet into a plurality of spaced separate elements using a cutter which is pressed into the sheet to cut therethrough, (3) making one side of the plurality of spaced separate elements to stand proud of a surface of a jig provided to hold the elements in place, (4)

---

[2] Although McDavid alludes to the doctrine of equivalents in its supplemental reply brief by using function-way-result language, (*see* Dkt. 163, Pls.' Reply Supplemental Br. Supp. Mot. Prelim. Inj. 4 (filed under seal)), McDavid has not developed this argument, and consequently the court considers it waived. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party . . . presents only a skeletal or undeveloped argument . . . we deem the argument waived.").

6

bonding a flexible resiliently stretchable substrate to one side of the separate elements by heating the substrate either to activate an adhesive applied between said one side of the separate elements and the substrate or to weld the separate elements to the substrate, and (5) at least said one side of the sheet is coated with a hot-melt adhesive prior to being cut into the plurality of spaced separate elements. ('325 patent, col. 6:34-48; 7:5-7.)

Before the court issued its claim construction determinations on September 17, 2009 [137], the parties disputed whether the method used to make Nike's "ProCombat" padding includes "spaced separate elements," a "stand proud" step, and a "jig." (*See* Dkt. 58, Pls.' Mem. Supp. Pls.' Mot. Prelim. Inj. 7-8 (filed under seal); Dkt. 80, Def.'s Opp. Pls.' Mot. Prelim. Inj. 4-8 (filed under seal).) The court's claim construction has led the parties to focus their infringement arguments on whether the excess material in the foam sheet is a "jig," as contemplated by the '325 patent.

**B. Method 2 – Used by Finn Tech from December 25, 2008 through the Present Day**

The parties agree that Finn Tech's Method 2 of manufacturing does not use a jig device separate from the foam sheet to hold the elements in place. In the court's claim construction, however, the court construed the term "jig" to mean "a device or tool that is different from the material on which the manufacturing work is performed that holds the elements created by the patented manufacturing process in the correct position during the manufacturing process." (Dkt. 137, Mem. Op. at 9.) In arriving at this construction, the court specifically determined that the excess material of the Finn Tech manufacturing process could not serve as a "jig" as contemplated by the '325 patent. Nevertheless, McDavid now argues that the excess material created by Finn Tech's Method 2 is transformed into a jig once the sheet of resilient material is cut. Specifically, McDavid contends that the excess material becomes a jig once the spaced separate elements are

formed, and that the excess material is not "material on which the manufacturing work is performed" because, as McDavid argues, after the cutting process is complete, no work is performed on the excess material.

Based on this court's construction of the term "jig," the court finds that McDavid's latest theory of infringement of the '325 patent is unavailing and not likely to succeed on the merits. Claim 1 of the '325 patent specifically states that the "jig" is "provided" to hold the spaced separate elements. This court concluded in its September 17, 2009 claim construction opinion that this step of providing a "jig" indicates that the "jig" in the '325 patent is separate from the foam material from which the spaced separate elements and excess material are cut. McDavid argues that the excess material is transformed into a jig through the process of cutting and peeling away the adhesive on the excess material prior to the bonding step. However, the court considers the entire sheet of resilient material that is a part of the manufacturing process to be the "material upon which work is performed." (Dkt. 137, Mem. Op. at 9.)

Furthermore, work on the excess material is not ended once the cutting process is complete. Nike correctly asserts that in the Finn Tech Method 2 after the foam sheet is cut into both the elements and the excess material, the Finn Tech workers then peel adhesive from the excess material. Thus, the excess material continues to be "material upon which worked is performed" after the cutting stage of the Method 2 manufacturing process has concluded. Additionally, the excess material continues to be "material upon which worked is performed" while the excess material remains in position holding the spaced separate elements in place during bonding because the work of removing the excess material from the elements occurs after the bonding stage of Finn Tech's Method 2. Consequently, the court does not agree with McDavid's arguments that the excess

8

material is "transformed" to be a "jig," as contemplated by the '325 patent, at the conclusion of the cutting stage. (Dkt. 163, Pls.' Reply 2-7 (filed under seal).) To say that the excess material is a jig is inconsistent from this court's ruling that the "jig" claimed in the '325 patent is a "provided" device and not a by-product of the manufacturing process. In the Finn Tech Method 2 process, excess material is not a device that is "provided" after the cutting step, but continues to be "material upon which work is performed." (Dkt. 137, Mem. Op. at 9.) McDavid's expert, Glenn Beall, recognized that this court's claim construction specifically found that the excess material is not a jig. (Dkt. 149, Dep. Glenn Beall 7:8-11, Oct. 21, 2009 (filed under seal).)

As a result, this court finds that Finn Tech's manufacturing Method 2 does not have a "jig" as that term has been construed by this court. Additionally, because literal infringement requires that the accused method include every claim limitation, and the parties currently only dispute whether Method 2 uses a "jig," the court need not address whether Method 2 has the other limitations claimed in dependent Claim 8 of the '325 patent. McDavid, therefore, has not met its burden of proving a likelihood of success on its infringement claim with regard to Finn Tech's Method 2.

### C. Method 1 – Used Before December 25, 2008

McDavid also alleges that Finn Tech's Method 1 infringes dependent Claim 8 of the '325 patent. Because the exact process performed in Method 1 is unclear from the record, McDavid urges the court to apply a presumption of infringement under 35 U.S.C. § 295. Section 295 provides that a product is presumed to infringe a patented process if:

> (1) a substantial likelihood exists that the product was made by the patented process, and
>
> (2) the plaintiff has made a reasonable effort to determine the process actually used

in the production of the product and was unable to so determine.

35 U.S.C. § 295. McDavid argues that it has satisfied section 295 because (1) David Stirling Taylor reverse-engineered the Finn Tech padding made by Method 1 and found that it was likely that the padding was made by the '325 patented process; and (2) McDavid has made a reasonable effort to discover the method employed in Method 1 and has not been able to do so. Although McDavid may have made a reasonable effort to discover the method employed in Finn Tech's Method 1, this court does not find a substantial likelihood that Method 1 employed the '325 patent's claimed process.

As discussed above, this court has determined that McDavid has failed to prove the likelihood that Finn Tech's Method 2 infringes the '325 patent. Therefore, because the evidence in this record demonstrates that a non-infringing method for manufacturing Nike's "ProCombat" padding exists, there is not "a substantial likelihood" that the Nike "ProCombat" products were made by the patented process. Consequently, even though McDavid presented evidence that Mr. Taylor reverse-engineered the padding made by Finn Tech's Method 1 and concluded that the padding was likely made by the '325 patent's process, (*see generally* Dkt. 54, David Stirling Taylor Decl., attached as Ex. 2 to Pls.' Mem. Supp. Pls.' Mot. Prelim. Inj.), the presence of a non-infringing alternative undermines his conclusion. For example, during Mr. Taylor's reverse-engineering process, he performed one test without the requisite "stand proud" step of the '325 patent and concluded that the Finn Tech manufacturing process requires one side of the spaced separate elements to stand proud of the surface of the waste material in order to prevent the excess material from being bonded to the fabric along with the elements. (*Id.* at ¶¶ 22-25.) The court disagrees. The Finn Tech manufacturing step of coating only the elements, and not the excess material, with the hot-melt adhesive is what prevents the excess material from bonding to the fabric; any "stand

proud" or height differential between the elements and the excess material is not a necessary part of the Finn Tech manufacturing process. Nevertheless, Mr. Taylor concluded that Method 1 must have used the "stand proud" step of the '325 patent. The court is not persuaded by Mr. Taylor's speculative conclusion that Finn Tech's Method 1 likely infringes the '325 patent.

Because Mr. Taylor's declaration is the only evidence in the record indicating that Finn Tech's Method 1 infringes the process disclosed in the '325 patent, the court does not find a substantial likelihood that the Nike "ProCombat" product made by Finn Tech's Method 1 employed the '325 patent's process. Therefore, the court holds that 35 U.S.C. § 295 does not apply, and additionally finds that McDavid has not satisfied its burden of demonstrating a likelihood of success on the merits with respect to Finn Tech's Method 1.

## II. Irreparable Harm

To prevail, McDavid also must demonstrate that it has no adequate remedy at law and it will suffer irreparable harm if a preliminary injunction enjoining Nike's importation and sale of its "ProCombat" products is not entered. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1366 (Fed. Cir. 2008). *See also, Acumed L.L.C. v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008); *World Kitchen (GHC), L.L.C. v. Zyliss Haushaltwaren AG,* No. 04-2999, 2004 U.S. Dist. LEXIS 26797, at *18 (N.D. Ill. Nov. 24, 2004).

### A. Irreparable Harm Analysis as to Finn Tech's Method 1

As to Finn Tech's Method 1, the court finds that McDavid has not shown any irreparable harm because, according to Daniel Kim, President of Finn Tech, Finn Tech no longer employs this process. (Dkt. 72, Decl. Daniel Kim ¶ 5 (filed under seal).) McDavid urges this court not to accept Mr. Kim's declaration as conclusive evidence that Finn Tech has permanently discontinued Method

1, but McDavid, which has the burden of proof, has not presented any evidence suggesting that Finn Tech has not discontinued Method 1. Moreover, McDavid has not presented any evidence indicating that Finn Tech is likely to use Method 1 at any time in the future. Therefore, any damage that was caused by Method 1 is in the past and "properly the subject of money damages." *Wilson Sporting Goods Co. v. Head Sports, Inc.*, No. 98-1315, 1999 U.S. Dist. LEXIS 1614, at *22 (N.D. Ill. Feb. 8, 1999); *see also Campbell Soup Co. v. ConAgra Inc.*, 977 F.2d 86, 93 (3d Cir. 1992) (vacating the trial court's preliminary injunction based on trade secret misappropriation in part because the evidence indicated that the enjoined method had been discontinued and the defendant had no plans to renew it). McDavid therefore has failed to carry its burden of proving irreparable harm with respect to Method 1.

### B. Irreparable Harm Analysis as to Finn Tech's Method 2

As to Finn Tech's Method 2, McDavid argues that its loss of sales and market share constitutes evidence of irreparable harm warranting a preliminary injunction. According to established Federal Circuit law, however, loss of sales, profits or market share does not necessarily establish irreparable harm. *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1347-48 (Fed. Cir. 2006) ("[W]e do not doubt that generic competition will impact Abbott's sales . . . but that alone does not establish that Abbott's harm will be irreparable."); *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) (same discussing profits); *Nutrition 21 v. United States*, 930 F.2d 867, 871-72 (Fed. Cir. 1991) (same discussing market share); *see also Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*, No. 05-1887, 2007 U.S. Dist. LEXIS 65792, at *39 (D.N.J. Sept. 6, 2007) (recognizing that market share is economic loss compensable with money damages). Based on the evidence McDavid has presented, the court finds that McDavid's presentations as to its

alleged loss of sales and loss of market share have not established the requisite irreparable harm to warrant a preliminary injunction.

### 1. Loss of Sales

Although McDavid argues that Nike's expansive advertising and marketing campaign for the "ProCombat" line is designed to, and will, substantially reduce McDavid's sales and result in irreparable harm, McDavid has failed to provide evidence substantiating these allegations. For example, McDavid argues that Nike's products directly compete with those of McDavid, further exacerbating its harm. McDavid also contends that certain universities "have stopped or reduced the amount of foam padded shorts purchased from McDavid," (Dkt. 54, May 20, 2009 Fee Decl. ¶ 4, attached as Ex. 8 to Pls.' Mem. Supp. Mot. Prelim. Inj.), and that this reduction in sales was at the direction of Nike, which has exclusive contracts with several universities. (*Id.*; Dkt. 121, July 22, 2009 Fee Decl. at Ex. 1, attached as Ex. 30 to Pls.' Reply Mot. Prelim. Inj (filed under seal).) McDavid additionally predicts that it will be required to "discharge numerous employees" and "reduce the number of sales representatives" if it loses sales. (May 20, 2009 Fee Decl. ¶ 13.) Notably, McDavid has not presented this court with evidence of any actual loss of market share or overall sales, but instead offers conclusory affidavits based on speculation to prove these losses. In this case, the court finds that such speculation is insufficient to justify injunctive relief prior to a trial on the merits. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990) ("[A] district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff.").

Moreover, the evidence in the record indicates that McDavid has not experienced any apparent losses in overall sales since the launch of Nike's allegedly infringing products. In fact,

based on McDavid Vice President Terence M. Fee's testimony, McDavid's revenue is consistent with the previous year's despite the launch of Nike's "ProCombat" line, which occurred about eighteen (18) months ago.[3] (Dkt. 82 at Ex. F, Dep. Terence M. Fee 17:9-11, 30:13-17, June 10, 2009 (filed under seal).) Fee further testified that he was unaware that McDavid's 2009 "Hexpad" garment sales decreased compared to 2008 sales. (*Id.* at 30:2-14.) In other words, although Nike's "ProCombat" product line has been on sale for more than a year, based on the evidence before the court, Nike's sales have yet to impact McDavid's overall sales or revenue. Thus, the court finds that McDavid does not face an imminent threat of loss of future sales by Nike's continued sales during this litigation. *See Laminations, Inc. v. Roma Direct Mktg. L.L.C.*, 516 F. Supp. 2d 404, 419 (M.D. Pa. 2007) (explaining that there is no irreparable harm where the plaintiff failed to show lost sales even through the accused product had been on sale for about a year before preliminary injunction hearing).

Even assuming McDavid could prove that it was losing sales based on Nike's "ProCombat" line, any such losses could be recovered as money damages from Nike if McDavid were ultimately to prevail in this action. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) (finding that lost sales alone do not demonstrate irreparable harm); *see also Judkins v. HT Window Fashions Corp.*, 514 F. Supp. 2d 753, 767 (W.D. Pa. 2007) (finding no irreparable harm because the harm alleged was lost business, which the court found was compensable through monetary relief). McDavid does not allege, nor does this court have any basis to find, that Nike would not be able to satisfy a monetary judgment if one were to be entered against Nike and in favor

---

[3] From the record, the court cannot discern precisely when Nike launched its "ProCombat" line. Mr. Fee, however, testified that he was aware of the product in the market by at least the summer of 2008.

of McDavid in this case.

### 2. Loss of Market Share

McDavid similarly has not provided this court with evidence of an actual decrease in McDavid's market share. "[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991); *see also MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 577 (E.D. Va. 2007) ("[T]he *potential* for loss of market share is insufficient to establish" irreparable harm); *Novartis Pharms. Corp. v. Teva Pharms. U.S.A., Inc.*, No. 05-1887, 2007 U.S. Dist. LEXIS 65792, at *39 (D.N.J. Sept. 6, 2007) ("[L]oss of market share . . . [is an] economic harm[] . . . compensable by money damages."). Without such evidence, McDavid has failed to prove it will be irreparably harmed based on its alleged loss of market share.

### 3. Additional Irreparable Harm Arguments

McDavid also argues that Nike's sales of the allegedly infringing padding will encourage others to infringe. However, this court has previously determined that it is unlikely that the manufacturing processes of Nike's "ProCombat" products infringe the '325 patent. Consequently, the court does not perceive a threat that Nike's conduct will encourage others to infringe. In addition, McDavid's argument that Nike is "free-riding" on McDavid's investments similarly fails; McDavid has not presented any evidence in support of this assertion.

As a result, McDavid has failed to show an irreparable harm sufficient to justify the granting of a preliminary injunction enjoining the importation and sales of any Nike products containing padding manufactured through the use of either of Finn Tech's Methods 1 or 2. Based on the above, the court finds that McDavid has not proven a likelihood of success on the merits or irreparable

harm. Therefore, McDavid's Motion for Preliminary Injunction is denied, and the court need not proceed further in its analysis to a balancing of hardships or evaluating the public interest. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (cited by *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1366-67 (Fed. Cir. 2008)).

**III.     Request for Bond**

Because this court denies McDavid's Motion for Preliminary Injunction, Nike's request for a bond is denied as moot.

## CONCLUSION

For the reasons stated in this memorandum opinion, McDavid's Motion for Preliminary Injunction [52] is denied.

This case is set for status on February 11, 2010 at 9:00 a.m. to discuss and set further dates. The parties are strongly encouraged to discuss settlement.

ENTERED:     JANUARY 14, 2010

_____
James F. Holderman
Chief Judge, United States District Court